Grafton
No. 91-399

## Lawrence Guaraldi d/b/a Century 21 Guaraldi Agency

### v.

### The Trans-Lease Group and John McCarthy

December 3, 1992

*McNamara, Schuster, Wheeler & Buttrey, P.A.*, of Lebanon (*Claude T. Buttrey* and *Barry C. Schuster* on the brief, and *Mr. Schuster* orally), for the plaintiff.

*Gormley, Mayer & Gormley, P.C.*, of Nashua (*Arthur O. Gormley, III* on the brief and orally), for the defendants.

BROCK, C.J.    The defendants appeal the Superior Court's (*Smith,* J.) order awarding the plaintiff a real estate commission and attorney's fees. We affirm the award of a commission and reverse the award of attorney's fees.

In April 1987, defendant John McCarthy signed a listing agreement giving the plaintiff, Century 21 Guaraldi Agency, exclusive authority for four months "to offer for sale and/or to sell" a house and 61 acres of land located in Enfield, which the defendant owned under the name of the Trans-Lease Group, a business located in Massachusetts. The agreement provided that the listing price for the property was $190,000, and that the plaintiff's commission would be seven percent. Ronald Bedell was the licensed real estate broker acting as agent of the plaintiff. The parties later extended the agreement to November 30, 1987.

During April and May 1987, the plaintiff forwarded four offers to McCarthy. McCarthy rejected them because they were either lower

than the listed price or contained unacceptable contingencies. On September 8, 1987, Bedell spoke to John Barston, an associate of McCarthy, who indicated that McCarthy had made improvements to the Enfield property and a price increase was therefore needed. On September 9, Patty Kelter, another associate in McCarthy's office, told Bedell that McCarthy was having the siding replaced, the roof repaired, and the porch fixed. Based on this information, and believing that the work had been completed, Bedell sent McCarthy a price change form instructing him to indicate the increased purchase price and to sign and return the form. McCarthy never executed the form.

On September 10, 11, and 12, Bedell visited the Enfield property and observed that although some work had been done on the porch, no work had been done on the siding or the roof. On September 11, Bedell sent a letter to McCarthy informing him that there were three more offers on his property, including one from Walter and Sam Tucker for $190,000 with no contingencies. Bedell indicated that the Tuckers believed their offer should be accepted as it was a full price offer. Bedell also stated that he had mentioned to the Tuckers that improvements were being made to the property, and he thought that he could get the Tuckers to agree to pay for the cost of improvements to date because it appeared that little work had actually been completed. On September 12, Bedell received a letter from McCarthy, which had been typed on September 9, stating that improvements had been made to the house and the listing price would need to be adjusted. No new price, however, was indicated.

On September 15, Julian D'Augustine, an attorney working for McCarthy, told Bedell that McCarthy wanted to sell the land for $190,000 and have the buyers move the house, at the buyers' expense, to a new lot for the seller. Bedell relayed this counteroffer to Walter Tucker who rejected it. On September 17, McCarthy told Bedell that he did not want to move the house, but instead would stop the work he was doing on the property and come back with a price by September 25 that would include the work done to date. McCarthy never did so, however, and the Tuckers subsequently withdrew their offer.

In October 1987, McCarthy indicated to Bedell that as soon as the remodeling work was complete he would forward a change of instruction form with the new purchase price. Throughout the month of October Bedell requested the price increase, and McCarthy's associates continued to tell him that the work had not been completed and they had not determined a new price. At the end of November 1987, Bedell sent a new listing agreement to McCarthy because the

extended agreement expired at the end of that month. In January 1988, McCarthy informed Bedell that he did not want to list the property with him.

Bedell testified that prior to the Tucker offer of September 11, 1987, his understanding of discussions concerning improvements to the property was that after the improvements had been completed a price increase would have to be implemented. Bedell indicated to prospective purchasers that improvements were contemplated, and that a future price increase was possible. Bedell believed, however, that he was operating under the $190,000 written listing agreement and would continue to do so until he received written instructions from McCarthy to the contrary. On cross-examination Bedell testified that he was willing to try to get the Tuckers to negotiate upward from the listing price based on improvements not because he thought the listing price had increased, but because he was working for McCarthy and trying to get him the best possible deal.

McCarthy testified that when his office told Bedell prior to the Tucker offer that improvements were being made to the property and that the price would have to be increased, then the original listing of $190,000 no longer existed. McCarthy explained that he never filled in the change of instruction form because he did not know what the final price was going to be, but that Bedell understood the listing price was changed from $190,000 to $190,000 plus the cost of improvements. In response to questioning from the court, McCarthy indicated that between August 1 and September 17, 1987, he never spoke directly to Bedell and at no time, despite Bedell's repeated requests, did he inform Bedell of the new purchase price.

The trial court ruled that there was no oral modification of the list price and, therefore, that the plaintiff was due a commission of $13,300 for producing the Tuckers, who were ready, willing and able to purchase the defendants' property for $190,000. In addition, the court found that the plaintiff was forced to seek judicial assistance to secure payment for work done for the defendants when their position was patently unreasonable, and ordered the defendants to pay the plaintiff's attorney's fees and costs.

We first address the defendants' assertion that the trial court erred as a matter of law when it found that the parties did not orally modify the listing price to $190,000 plus the cost of improvements. Contractual obligations can be modified by either an express or implied mutual agreement between the parties. *See Watkins v. Carrig*, 91 N.H. 459, 462–63, 21 A.2d 591, 593 (1941). It is a funda-

mental principle of contract law that one party to a contract cannot alter its terms without the assent of the other party; the minds of the parties must meet as to the proposed modification. *See Turcotte v. Griffin*, 120 N.H. 292, 294–95, 415 A.2d 668, 669 (1980); *KECO Industries, Inc. v. AFC Industries Incorporated*, 316 F.2d 513, 516 (4th Cir. 1963). While such an agreement may be inferred from the conduct of the parties, it is not sufficient to show an ambiguous course of dealing from which one party might reasonably infer that the original contract was still in force, and the other that it had been changed. *See Davenport Osteopathic Hosp. Ass'n v. Hospital Serv.*, 154 N.W.2d 153, 158 (Iowa 1967).

Whether there was a mutual agreement between these parties as to the listing price was a question of fact to be determined by the trier of fact, in this case the trial judge. Such findings "will not be overturned on appeal unless lacking in evidential support or tainted by error of law." *Gelinas v. Metropolitan Prop. & Liability Ins. Co.*, 131 N.H. 154, 160–61, 551 A.2d 962, 968 (1988). Our function on appellate review "is not to decide whether we would have found differently but to determine whether a reasonable person could find as did the trial judge." *Liberty Mut. Ins. Co. v. Custombilt, Inc.*, 128 N.H. 167, 170, 512 A.2d 1098, 1100 (1986) (quotation omitted).

Bedell and McCarthy presented conflicting interpretations of conversations and correspondence between them concerning improvements to the Enfield property and their effect on the original listing price of $190,000. The trial court stated in its order that it "fail[ed] to find the testimony regarding the alleged modification of the list price credible because none of the correspondence between the parties reflect such an event." It was "within the province of the trial court as the fact-finder to assess the credibility of and the weight to be accorded each witness' testimony," *N.H. Bituminous Co., Inc. v. TAB Aviation, Inc.*, 132 N.H. 38, 43, 566 A.2d 153, 156 (1989), and to credit or discredit the conflicting testimony in order to make factual determinations. *See Bourdon's Case*, 132 N.H. 365, 370–71, 565 A.2d 1052, 1055–56 (1989). Apparently the trial court chose to credit Bedell's testimony that he continued to operate under the $190,000 listing price, and our review of the record indicates that there was sufficient evidence to support the reasonable inference that the parties had not reached the point of mutual assent.

The defendants further contend that the trial court incorrectly found that McCarthy executed a subsequent exclusive right to

sell agreement in November 1987 in which he did not adjust the list price. Although we agree that there was no direct support in the record for this finding, there is substantial other evidence and findings supporting the trial court's decision, and "there is no indication that, but for this erroneous finding, the trial court would have ruled differently." *Drop Anchor Realty Trust v. Town of Windham*, 134 N.H. 81, 86, 587 A.2d 1240, 1244 (1991). We therefore decline to reverse the trial court's decision on that basis.

The defendants next argue that the trial court abused its discretion when it awarded the plaintiff attorney's fees. The trial court found that the defendants believed that they could avoid paying the plaintiff if they prolonged the negotiations, forcing the plaintiff to ultimately bring suit when there was no reasonable basis for the defendants not to pay. The court further stated that "[b]ased upon the evidence presented and correspondence between the parties, together with the Court's observations, this Court concludes that defendants' conduct towards plaintiff in failing to pay the latter his commission . . . can only be characterized as bad faith conduct." Because the record does not support the court's findings, we reverse.

■ The general rule in New Hampshire is that attorney's fees do not automatically flow in favor of a prevailing civil litigant. *See Adams v. Bradshaw*, 135 N.H. 7, 16, 599 A.2d 481, 487 (1991), *cert. denied*, — U.S. —, 112 S. Ct. 1560 (1992) (each party to a lawsuit generally responsible for payment of his or her own lawyer's bill). Rather, fees may be awarded only by virtue of "statutory authorization, an agreement between the parties, or an established exception." *Maguire v. Merrimack Mutual Ins. Co.*, 133 N.H. 51, 55, 573 A.2d 451, 453 (1990). Exceptions include: "[w]here an individual is forced to seek judicial assistance to secure a clearly defined and established right" if bad faith can be established, *Harkeem v. Adams*, 117 N.H. 687, 691, 377 A.2d 617, 619 (1977); "where litigation is instituted or unnecessarily prolonged through a party's oppressive, vexatious, arbitrary, capricious or bad faith conduct," *St. Germain v. Adams*, 117 N.H. 659, 662, 377 A.2d 620, 623 (1977); and as "compensation for those who are forced to litigate in order to enjoy what a court has already decreed" and for those who are "forced to litigate against an opponent whose position is patently unreasonable," *Keenan v. Fearon*, 130 N.H. 494, 502, 543 A.2d 1379, 1383 (1988).

■ We hold that the defense of oral modification of the listing agreement was not "patently unreasonable," even if ultimately unsuccessful. The record contains conflicting testimony and documen-

tary evidence which was subject to more than one reasonable interpretation. While we affirm the trial court's resolution of these conflicts, we cannot hold that the defendants' position "lacked any reasonable basis in the facts provable by evidence, or . . . in the law as it is, or as it might arguably be held to be." *Adams v. Bradshaw*, 135 N.H. at 18, 599 A.2d at 488 (quotation omitted).

Furthermore, we note that the record is void of evidence indicating whether the plaintiff ever requested the payment of a commission from the defendant and whether such a request was denied. Absent evidence of the parties' conduct prior to the institution of the present lawsuit, we cannot hold that the plaintiff has been forced to litigate to recover its commission or that the defendants' conduct amounted to bad faith. *See N.H. Bituminous Co., Inc.*, 132 N.H. at 44, 566 A.2d at 156. We therefore reverse the trial court's award of attorney's fees to the plaintiff.

*Affirmed in part; reversed in part.*

All concurred.